AF Approval _____                                    Chief Approval 

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FILED
5/8/2019 ___ cmc/LMF
Date                              Time
CLERK U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

UNITED STATES OF AMERICA

v.                                    Case No. 2:18-cr-19-FtM-38CM

ALISON MARIE SHEPPARD,
a/k/a "Aiisha Abdullah"

**PLEA AGREEMENT**

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Maria Chapa Lopez, United States Attorney for the Middle District of Florida, and the defendant, Alison Marie Sheppard, and the attorney for the defendant, Russell K. Rosenthal, mutually agree as follows:

A.   **Particularized Terms**

1.   **Count Pleading To**

The defendant shall enter a plea of guilty to Count One of the Indictment. Count One charges the defendant with Attempting to Provide Material Support and Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1) and § 2.

2.   **Maximum Penalties**

Count One carries a maximum sentence of imprisonment of 20 years, a fine of not more than $250,000, a term of supervised release of any term of years or life, and a special assessment of $100. With respect to certain offenses,

Defendant's Initials AS

s 30

the Court shall order the defendant to make restitution to any victim of the offense(s), and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3.   Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty.  The elements of Count One are:

First:   The Defendant knowingly attempted to provide material support
or resources to ISIS, a foreign terrorist organization; and

Second:   The Defendant did so knowing that the organization was a
designated terrorist organization, or that the organization had
engaged in or was engaging in terrorist activity or terrorism.

4.   No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

5.   Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's

applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

6.   Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will not oppose the defendant's request to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.4., the United States agrees to make a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level.

The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

7.    Low End

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will not oppose the defendant's request to the Court that the defendant receive a sentence at the low end of the applicable guideline range, as calculated by the Court.  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

# REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

11.     <u>Forfeiture of Assets</u>

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (G) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any

Defendant's Initials _A<_                          8

forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is

Defendant's Initials _AS_            9

deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this

Defendant's Initials _AS_____               10

agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B.   Standard Terms and Conditions**

   1.   Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.  The special

Defendant's Initials _AS_                         11

assessment is due on the date of sentencing.  The defendant understands that this agreement imposes no limitation as to fine.

2.    Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case,

subject to any limitations set forth herein, if any.

    5.    <u>Financial Disclosures</u>

       Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in

Defendant's Initials _<u>  /s  </u>_          13

order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.   <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.   <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the

Defendant's Initials _AK_                    14

right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from her waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8. <u>Middle District of Florida Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9. <u>Filing of Agreement</u>

This agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may

later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offense(s) to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   <u>Factual Basis</u>

The defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

FACTS

Beginning in or about January 2017, and continuing until on or about July 18, 2017, in the Middle District of Florida and elsewhere, the defendant knowingly attempted to provide material support and resources, namely, ten cellular telephones, to the Islamic State, also known as ISIS, knowing that ISIS was designated a Foreign Terrorist Organization and that ISIS had engaged in and was engaging in terrorist activity and terrorism, in violation of 18 U.S.C. § 2339B(a)(1).

<strong>Overview of ISIS and Investigation</strong>

On October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawid wa' al-Jahid, as a

Defendant's Initials _AS_                      17

Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.  On May 15, 2014, the Secretary of State amended the designation of al Qaeda in Iraq as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the Foreign Terrorist Organization listing:  the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  In an audio recording publicly released on June 29, 2014, ISIS announced a formal change of its name to the Islamic State.

On September 21, 2015, the Secretary of State added the following aliases to the Foreign Terrorist Organization listing: Islamic State, ISIL, and ISIS. To date, and throughout the time period charged in the Indictment, ISIS has remained a designated Foreign Terrorist Organization.

At all relevant times, the defendant lived in Punta Gorda, in the Middle District of Florida, and knew that ISIS was designated as a Foreign Terrorist Organization, and that ISIS had engaged in, and was engaging in, terrorist activity and terrorism.

Defendant's Initials _*AS*_                    18

An ongoing investigation conducted by the Federal Bureau of Investigation ("FBI") revealed that an individual attempted to travel from the United States to the Middle East in early 2017 for the purpose of providing material support, namely himself as a fighter, to ISIS. This individual was unsuccessful in his attempt to travel overseas to join ISIS because of law enforcement intervention. This individual (hereinafter referred to as "CW-1") was arrested in March 2017, charged, and agreed to cooperate. Prior to and after CW-1's arrest, CW-1 was in regular contact via electronic means and social media with the defendant, who encouraged and attempted to facilitate CW-1's plans to travel overseas for the purpose of providing material support to ISIS. The defendant also discussed with CW-1 and others the facilitating of travel of other individuals to join ISIS, and the defendant attempted to provide material support to ISIS in the form of property and/or communication equipment by sending cellphones the defendant believed would be used by ISIS members overseas to create improvised explosive devices.

### The Defendant Becomes Part of CW-1's Efforts to Join ISIS

In the Fall of 2016, an undercover law enforcement officer ("UCE-2"), posing as a female interested in traveling overseas, met CW-1 online (before CW-1 was arrested). In early 2017, CW-1 expressed interest in traveling overseas to commit violent jihad and soon the two were discussing CW-1's interest in marrying UCE-2. CW-1 and UCE-2 began discussing the logistics of traveling

Defendant's Initials _As_          19

overseas to join a terrorist group. CW-1 had been in online communications with the defendant previously, and the three began to communicate about CW-1 and UCE-2's interest in traveling overseas to join ISIS.

In December 2016, an FBI employee acting in an undercover capacity ("UCE-1") began engaging in online conversations with the defendant. The defendant and UCE-1 developed an online relationship.

On January 11, 2017, CW-1, UCE-2, and the defendant had a recorded conversation using Facebook. The defendant told CW-1 and UCE-2 that a specific online communication application was "totally encrypted" and safe. The defendant further stated that another social media application "is the safest out of the safest you can get; actually a lot of terrorist people use it because nobody could hack into it . . . ." UCE-2 stated that she had a lot of questions for CW-1 but was concerned that someone could be watching. The defendant suggested that CW-1 and UCE-2 speak using code words. CW-1 stated that he had a strategy for everything and when he said something that did not make sense, it was because he was trying to play it safe.

On March 10, 2017, CW-1 and UCE-2 communicated through social media. UCE-2 asked CW-1 whether the defendant was aware that CW-1 and UCE-2 would be traveling overseas. CW-1 stated that he had informed the defendant of their travel plans. CW-1 then sent UCE-2 a PDF file containing the ISIS e-book "Hijrah Guide to the Islamic State." CW-1 told UCE-2 that he had

Defendant's Initials _AS_          20

gotten the e-book from "Aiisha" (an alias used by the defendant), and that UCE-2

should "download it, then read it, memorize then delete." This guide, published

by ISIS, included details such as how ISIS members get into and out of Syria,

setups for packing, knowing strengths and weaknesses, getting stopped in Turkey,

how operatives get through airport security without blowing their cover, and

stories of Arab fighters' migration to Syria. The guide included operational

security techniques to assist foreign fighters in evading detection on their way to

join ISIS. CW-1 then stated that the defendant had asked CW-1 whether a

brother from overseas (hereafter "Foreign Subject") could travel with him when

CW-1 departed the United States.

Later that day, via a social media application, the defendant

informed UCE-2 that the defendant knew and trusted the Foreign Subject. The

defendant stated that the Foreign Subject wanted to travel with CW-1 and UCE-2

and that the Foreign Subject was "legit." The defendant stated, "I can tell the

agents and spy's and insincere people." The defendant explained that the Foreign

Subject had been waiting to join "dawlah" but did not have the right connections.

The defendant suggested that the Foreign Subject could fly to the United States to

meet CW-1 and they (CW-1 and the Foreign Subject) could depart together. The

defendant added that if the Foreign Subject could not afford the flight to come to

the United States, the defendant would purchase the ticket for him. The

defendant stated that the Foreign Subject could "stay with [CW-1] until they're

Defendant's Initials _As_          21

ready and prepare together or get him a hotel." The defendant also told UCE-2 that the defendant had advised CW-1 to "Get new cellphone And delete everything on old one and leave it on. And tape it under a random persons car on silent And they will think he is here and if they tracking him they will see him moving around the city."

On March 26, 2017, CW-1 was arrested by the FBI while trying to leave the U.S. to travel overseas and join ISIS. CW-1 agreed to cooperate with the FBI.

The next day, UCE-2 communicated with the defendant using a social media application. UCE-2 informed the defendant that CW-1 was doing well and was headed to "Disney" (Disney was a code the defendant, CW-1 and UC-1 agreed to use to refer to ISIS). The defendant stated that she was relieved to know that CW-1 was well because she had worried about him all day. The defendant further stated that the Foreign Subject would get his plane ticket once CW-1 arrived in (a specifically identified country). On April 17, 2017, UCE-2 informed the defendant that CW-1 had arrived.

On April 19, 2017, the defendant asked UCE-2 when she planned to travel to join CW-1. The defendant instructed UCE-2 to wear an "I love America" t-shirt so that she would look like a tourist. The defendant stated that if not for her children, she would be right by UCE-2's side. The defendant instructed UCE-2 to have a fake reason for travelling with supporting paperwork

Defendant's Initials _4ç_____          22

in case she was questioned about her reason for travel, and the defendant volunteered to research schools for UCE-2 in (a specifically identified country) to be used as a cover story for UCE-2 in case she was stopped.

### The Defendant Attempts to Provide Material Support and Resources to ISIS

On April 28, 2017, UCE-2 asked the defendant to let UCE-2 know if she knew anyone who wanted to make a donation to support the Mujahideen. The conversation continued into the next day, when the defendant stated that she would donate but not at the moment because she had no funds. The defendant further stated that she had asked the Foreign Subject for a donation and that when she had the funds she would send them by Western Union.

Several weeks later, on May 13, 2017, the defendant informed UCE-2 that the defendant had created codes for them to use to communicate going forward. Before sending the codes to UCE-2, however, the defendant instructed UCE-2 to take a screenshot of the codes and then delete the conversation from UCE-2's phone. After sending the codes, the defendant instructed UCE-2 how to use the codes.

On June 6, 2017, the defendant conversed with CW-1 via a social media application, and they discussed whether the Foreign Subject would be able to provide previously promised funds. CW-1 then added, "We can also use some phone to set off timer for pressure cookers for kuffars, phones are hard to come by here Allahu akbar!" The defendant asked, "What kind. Like cheap Walmart

Defendant's Initials _AS_____          23

phones?" CW-1 replied that "any phone would be great." The defendant responded, "Well I'm asking because if it cheap phone then I can send more than one like a bunch. Like as long as it have timer it good? Like that stopwatch option." The defendant further stated, "Remember not definite this month until I pay all the bills I'm figuring my financing today . . . But next month . . . if not this month."

UCE-1 spoke with the defendant by telephone about a week later, on June 15, 2017. UCE-1 discussed UCE-1's desire to do more for jihad, and the defendant stated "on that money thing whatever, if you ever have that in the future to do anything, there's ways. Just not on the phone right now." UCE-1 and the defendant discussed being careful online regarding their beliefs, and the defendant also discussed a video that she had shared on Facebook regarding phosphorous bombing in Raqqah. The defendant said that if UCE-1 wanted to travel, the defendant had a place to stay in (a specifically identified country). The defendant then began a simultaneous conversation with UCE-1 on a social media application with a customized delete feature. The defendant said that she had a way to give money to fighters so that UCE-1 would not get in trouble for aiding terrorism. The defendant then sent a snapshot of a self-created code and told UCE-1 to use the code when UCE-1 was ready to send something. The defendant told UCE-1 that if UCE-1 wanted to go overseas, she could facilitate UCE-1's travel and could connect her with a fighter once UCE-1 arrived. The

Defendant's Initials  _AS_                          24

defendant then identified a specific attack that had recently taken place and told UCE-1 that it was that group. The defendant then provided UCE-1 with a photograph that the defendant believed was of the fighter overseas training with ISIS.

The following day, the defendant told UCE-2 that she did not have enough money that month to send money or phones to CW-1, but that she would try the next month.

On July 11, 2017, UCE-1 offered to send $500 to the defendant as a donation for CW-1 and ISIS. The defendant immediately contacted UCE-2 and engaged in a three-way communication with UCE-1 and UCE-2. The defendant introduced UCE-1 to UCE-2 and provided UCE-1 shipping information so that UCE-1 could send the funds directly to UCE-2.

UCE-1 communicated with the defendant the next day using a method the defendant had created to further encrypt their conversation. UCE-1 informed the defendant that UCE-1 had sent UCE-2 money and UCE-1 provided the Western Union tracking number. The defendant asked UCE-1 to pledge an oath to Abu Omar al-Baghdadi and the defendant told UCE-1 that the defendant had already given her pledge. The defendant sent UCE-1 an audio file with the defendant's pledge for UCE-1 to recite, and UCE-1 did so. UCE-1 recognized the defendant's voice in the audio file from having spoken with her before.

On July 13, 2017, during a conversation over a social media

application, the defendant stated that UCE-1 had sent the money to UCE-2.

UCE-2 informed the defendant that the money had been received and thanked

her for the donation. The defendant was pleased and praised Allah.

UCE-2 communicated again with the defendant the next day, July

14, 2017, via a social media application, and she told the defendant that she had

spoken to CW-1, whom the defendant believed to be fighting with ISIS in the

Middle East. UCE-2 said that, even though CW-1was very happy and thankful

for the money she had sent, he wanted to know whether she would be sending the

phones (that the defendant had previously spoken about sending). UCE-2 told

the defendant that CW-1's "Amir" (chief or commander) was waiting for them

(the phones) and seemed disappointed to hear that they did not get them since it

was difficult for them to get phones over there. The defendant stated that she was

going to send 20 cellphones and asked UCE-2 for her address. The defendant

gave UCE-2 details on the safety measures she would take when she sent the

phones so that they could not be traced back to her. The defendant said that she

would wear a shirt stating that she loved America, that she would wear gloves

and a hat, and that she would take the batteries out of the phones. She stated that

she would include a message inside the package so if someone checked it they

would not be suspicious. The defendant also stated that she wanted to "set up

shop" before UCE-2 departed so that UCE-2 would "have connection here . . . .

In case supply needed or money ect."

Defendant's Initials _4S____                    26

Later that same day, the defendant communicated with UCE-1 via a social media application and informed UCE-1 that the brothers overseas needed phones.  UCE-1 agreed to send the defendant enough money for 20 phones at $10.00 each.  UCE-1 had suggested referring to the money as a wedding gift on Facebook, and she told the defendant that she would send her wedding present in an envelope.  The defendant and UCE-1 then staged a conversation on Facebook to explain that the impending money transfer was a cash wedding gift for the defendant.  UCE-1 then told the defendant that she had sent a total of "3" (meaning $300.00 in cash), and that "one whole one" (meaning $100) was for the defendant as a gift.

That very same day, UCE-1 sent $300.00 in cash, two lipsticks, a lip liner, and a congratulatory card to the defendant at her address in Punta Gorda, Florida.  The defendant planned to use $200 to purchase phones to send to UCE-2.  The defendant intended that UCE-2 would send the phones to CW-1 overseas to "set off timer for pressure cookers for kuffars," meaning, to be used by ISIS members as timers for improvised explosive devices.

On July 15, 2017, the defendant purchased ten cellular telephones, packing materials, and several birthday cards.  According to the receipts for these items, she paid cash and spent $158.02 for ten phones and packing materials and $83.05 to ship the phones.

UCE-1 sent the defendant a text later that day and asked whether all

Defendant's Initials _AS_                              27

went well.  The defendant responded, using the word rings instead of phones.
The defendant explained that she had bought ten phones instead of twenty
because the price had gone up to $20 each.

On July 16, 2017, the defendant communicated with UCE-2 via a
social media application and stated that she (the defendant) had purchased only
ten phones because the price had doubled.  The defendant stated that she would
use a fake name and address to hide her true identity when she sent the phones
and that she would create a birthday theme to avoid suspicion.  The defendant
explained to UCE-2 what to do upon receiving the phones: "When u get it
literally take everything and destroy it The papers and the cards burn them And
the packaging to each thing completely put them spare and DO NOT DO NOT
put in your trash Put it in someone else.  Public dumpster Ok? Like right away
Don't wait.  That should be first thing u do ok."

The defendant informed UCE-2 through a social media application
the next day that she had sent the phones by overnight delivery via the U.S.
Postal Service ("USPS").  According to the USPS confirmation, the phones were
to arrive on July 18, 2017, at the P.O. Box address UCE-2 had provided to the
defendant.  The defendant said that she had taken safety measures by using her
children's father, Male #1 (believed to be unwitting), to send the phones just in
case the defendant was on the watch list.  The defendant said that she had told
Male #1, "I need to send my friend a wedding gift and I give her abaya and it

need to be there tomorrow and he said no problem o do it don't worry Loioool. So I bring him with me and he hold it and give his id." The defendant warned UCE-2 that before she picked up the package, she should make sure that there was no law enforcement in the area in case they were under surveillance. The defendant gave UCE-2 a USPS tracking number.

On July 18, 2017, the FBI retrieved the defendant's package containing ten cellular telephones at the post office. UCE-2 informed the defendant that she had received the package by thanking "Ahmed, Brian, Rachel, Sarah, fatimah &a Haley" (as the defendant had previously told UCE-2, the defendant had written birthday cards for the above names and put them inside the package to deceive law enforcement if the package was intercepted). The defendant used her parents' address as the return address on the package.

Video surveillance recordings and sales receipts from five stores in Punta Gorda, Port Charlotte, and Rotonda West, Florida, show that the defendant purchased a total of ten cellular telephones (two from each store) with cash on July 15, 2017.

12.  Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _AS_            29

13. <u>Certification</u>

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _2nd_ day of _May_, 2019.

MARIA CHAPA LOPEZ
United States Attorney

_Alison Sheppard_
Alison Marie Sheppard
Defendant

_Jeffrey F. Michelland_
Jeffrey F. Michelland
Assistant United States Attorney

_Russell K. Rosenthal_
Russell K. Rosenthal
Attorney for Defendant

_Jesus M. Casas_
Jesus M. Casas
Assistant United States Attorney
Chief, Fort Myers Division

_Jeffrey F. Michelland for_
David C. Smith
Trial Attorney, Counterterrorism Section
U.S. Department of Justice

Defendant's Initials _AS_                           30